Good morning judges and council members. The United States Court of Appeals for the Ninth Circuit is now in session. Good morning and welcome to the Ninth Circuit everyone. I'm Judge Nelson and it's a pleasure to be here with my colleagues Judge Hunsaker and Judge Jack. We are particularly grateful for Judge Jack and her willingness to appear from Texas to help us with our caseload. We also want to extend a warm welcome to the council who will be arguing today. We look forward to the time, hopefully sometime soon and when we can all do this in person again. But we are very grateful in the meantime for our staff who has really helped this court keep up with its workload almost uninterrupted during this during this pandemic. In the meantime we hope that everyone is safe and sound. We ask that during your argument you please watch your time, keep to your allotted time frames and try and wrap up as time is concluding. Let us know if you'd like to reserve any time for rebuttal. We're ready to proceed with our oral argument calendar. We have four cases scheduled for argument today. One case has been submitted, that's Rodriguez v. Kernan, case number 19-15396. The first case set for oral argument today is United States v. Flores, case number 20-10105. And that case is set for 10 minutes per side. And council, if you're ready you may proceed. I'm missing somebody on the screen. I have Mr. Roach, but. I apologize your honor, I'm just sitting down. Oh, okay, sorry. Thank you. No, no, that's fine. Sorry My name is Brad Roach and I represent Wilmer Flores in this appeal. If I can reserve three minutes for rebuttal. On June 20th, 2016, Mr. Flores was an inmate at a federal correctional facility in the District of Arizona. During that time, he was involved with a physical altercation with a guard at the facility. And this charge of assault on a guard essentially arises from that interaction. His appeal, and my argument on his appeal, will primarily be related to the district court's findings and application of the sentencing guidelines in Mr. Flores's case. Briefly to recap. Does that mean you're, are you not going to discuss the in custody issue? Whether he was in custody or not? If the court has any questions, I'd be willing to address it. I had not planned on spending time with him. The only, the one question I have on that, and maybe you could address it, is on the standard of review. The government raised an issue of whether we should review that under plain error because your client had not raised that below. What is your opinion? Do you think that we should review that under plain error? Or is your position we should look at that at de novo review because your client raised it properly below? Judge, I would ask for de novo review. I had not realized that when I didn't raise that issue to the district judge as an objection that I might have been waiving some of my client's rights. So I think it's a procedural issue and I would request de novo review. And then I would submit on the, on the briefs based on that. Okay. All right. Go ahead. In June of 2016, Mr. Flores was in a correctional facility. The correction officer involved in this case has a history of significant congenital hip and bone problems that have caused her a number of surgeries over her lifetime. And before this event occurred, she had acquired an illness called complex regional pains syndrome, which as the neurologist who testified described it as essentially pain that has taken on life of its own and is unmanageable. About a year before this event in 2015, she had surgery to implant a electronic device in her back that would help her manage the pain. It would stimulate her spinal cord and cause the pain to be manageable. Again, it doesn't correct the underlying symptoms, doesn't correct the underlying illness, doesn't correct or get rid of the pain. It just helps her manage it better so that she does not feel it as much. So that being said, on June 20th, she was talking with my client who was in his cell and asked him to put cuffs on, which would involve him putting his hands outside the cell or slightly outside the cell. When that happened, she claimed that he reached through the cell, grabbed her arm and pulled her violently into the door, causing her to hit the door with her hip and shoulder. And that day after the event and sought medical attention at the jail and then at the emergency room later. It's important to note that she, well, the facts indicated that she had an additional hip surgery about two months after this incident. And then about a month and a half to two months after that, she went back to her neurologist who would put down in 2015 and put the electronic device in her back because she described to him that it was no longer working. She also described during the event, June 20th, that it had stopped working. And he took an x-ray and indicated that the electrode had migrated down and basically it was no longer working and she required additional surgery. So with that factual background, we get to my objections to the district court's findings. In the pre-sentence report, the pre-sentence report writer wrote in chapter, I'm sorry, in paragraph 18, the injury sustained during the assault required surgery and indicated that the neurologist had testified to that at the trial. And I would submit that as an inaccurate assessment of what was said. That is not true. The strongest term that the neurologist used was that the kind of activity that he saw on the video, because the actual interaction was all caught on video. That kind of interaction could have caused the electrode to migrate. It could have caused. He did not say- Did your client object to the pre-sentence investigation report, to that fact? Yes, yes, we did. And we explained why we objected in that the statement for four months later that this could have caused the migration of the electrode is vastly different from the paragraph 18 saying that the actions of the assault caused the migration and therefore having to have an additional surgery to implant a different- Do you believe that it would have been an abuse of discretion for the district court had the pre-sentence report said it could have caused this? Would it have been an abuse of discretion for the district court still to apply the enhancement based on that? Yes, because the facts did not support a clear and convincing conclusion that the actions of Mr. Flores caused that. Or even as the term was used in the sentencing guidelines, his activity involves that. All we know is that at some point four months down the line, after having a different surgery, her electrode had migrated down. It would have been completely unreasonable for the district court to say, look, yeah, maybe there were multiple causes here, but we think that this contributed to it. It was for involvement. Does the government have to show that it was 100% directly related to that or that it was 20% direct? In this particular case, what the neurologist testified to was that it either works or it doesn't work. If it had migrated out, it doesn't work at all, right? So it is not what he testified to was medically, it either did or did not. And the witness testified that it hurt that day, but she'd previously testified that sometimes her, or she testified that previously sometimes the electrode was not working because of a battery issue. So while you're focusing on the electrode, isn't the proof for aggravated assault that there was a substantial risk of serious bodily injury? Yes. And the judge found that that was true because he found that it caused that Mr. Flores's activity caused the electrode to migrate and therefore caused the surgery. So everything about all the judge's conclusions relate to the determination that paragraph 18 is correct and that he, this action caused, and that is not supported by the evidence and without support in inferences that may be drawn from the Flaxmere record. You want to reserve the remaining time, unless there's other questions at this point, you want to reserve for rebuttal? Yes, thank you. May it please the court, Shelley Clemons for the U.S. Attorney's Office for the District of Arizona. In this case, the district court did not err in its calculation of the guidelines. The district court made three guideline determinations in this case, their issue, and they all hinged on a finding that the defendant's actions involved serious bodily injury to the victim. The district court did not err and the record supports those findings. The defendant attempts to argue that because the victim had a pre-existing condition and Dr. Christiano's testimony was cautionary that, or not 100% yes it did, that somehow doesn't show that the defendant caused the victim's injuries in this particular case. That's just not what the record is in this particular matter. In this case, the victim on the day that she went to work, she was able to work, she was able to lift weights, she was able to exercise strenuously, and she was living a relatively pain-free life, but immediately after the defendant pulling her as hard as he could, slamming her into that heavy metal cell door, she felt immediate pain. Her testimony was that that pain was so severe that she felt nauseous and she started to throw up. In addition, prior to that, thanks to the medical intervention, she could feel that neurostimulator working, but immediately thereafter it was no longer working. She couldn't feel it pulsing and doing its job, but what she could feel is pain. For purposes of guidelines, there's a number of ways to show serious bodily injury. One of them is extreme physical pain, and the other one is by showing that the injury was such that it required, in this case, hospitalization and surgery. We have shown both of those. What's the requirement, if there is any, of knowledge on behalf of the prisoner here? Does he have to know? It's at least reasonable to infer that he wouldn't have thought that this kind of damage would have been caused by doing, obviously, it was a wrong act to begin with, but for purposes of the enhancement, he wouldn't have thought necessarily that it was going to cause serious bodily injury, what he did. But clearly it did, or arguably it did. Is there any sense that he has to know that his actions would cause that because of that specific individual that he's acting against? No, there isn't, Your Honor. Like any victim in case, it's kind of like the age-old standard, he takes them as he sees it. That was also addressed in Garcia Camacho, which we briefed in our case. In this particular case, assault on a federal officer is a general intent crime, and we don't have to prove that the defendant intended to cause injury. In this case, under guidelines, we only have to prove that he committed the felonious assault and that, in fact, it involved serious bodily injury. We don't have to prove direct causation. Or it created a substantial risk of serious bodily injury, which whether or not it dislodged anything, it certainly might have fallen into the category of creating a substantial risk of serious injury. As you say, you take your victim as you find them. Yes, and given the fact that he used her body, used that door basically as a weapon to slam her into it, he certainly had knowledge that substantial injury could recur regardless of her own physical condition. So the government doesn't have to prove an intent, and we don't have to prove that he knew what her physical condition was, only that he committed this felonious assault and, as a result, it involved serious bodily injury, which we have proven in this particular matter. Defense counsel mentioned that these leads migrated. In fact, they didn't migrate. These were leads that were anchored into her spine. And as Dr. Cresciano testified, it took a significant amount of force to remove them. And he watched the video of the assault, and he concluded, in his professional opinion, that what he saw was a sufficient amount of force to have actually caused those leads to become dislodged. Defense counsel also mentions that the intervening hip surgery. However, the victim testified that that was unrelated. Dr. Cresciano testified that it was unrelated. He didn't even know about it. But the fact that this injury is related is demonstrated first by the victim's testimony that she felt immediate pain upon being slammed into that door, as well as the fact that she could tell the neurostimulator wasn't working, which is corroborated by the medical testimony that the leads had been pulled down, as well as Dr. Cresciano's testimony, that this type of force was sufficient to cause. So it corroborates what the victim said as to a case. In addition, the leads, as Dr. Cresciano testified, are inserted up in the spine near the bra line. And that's a significant distance away from the hip. There's absolutely no reason to believe that an intervening hip surgery somehow affected this, where the leads were, way up by the bra line. When, in fact, she was already feeling pain immediately following the assault. In this particular instance, the evidence was sufficient for the court to correctly find that serious bodily injury occurred. Therefore, the court applied the correct base offense guideline, 282.2. It applied the correct enhancement for serious bodily injury, and it also applied the correct six-level enhancement for the official victim. Now, in regards to the standard review on the suppression issue, in this particular case, the defendant did file a motion to suppress, but he didn't object to the R&R. So, at the most, he has waived any arguments that the factual findings were incorrect. At the very least, he is subject to plain error review as to the court's legal conclusions. Well, I wanted to follow up on that, because I think there's some confusion in our... I don't know about confusion, but there's a couple of different kinds of cases we could take. And, I mean, what is the best case for failing to apply... failing to object, I guess, is your argument. Failing to object to a magistrate's report and recommendation automatically imposes plain error review. Bastidas v. Chappelle, and I believe it's the Morado case. And we also cited the unpublished decision of Monjarez. But, even if this court were to review it under de novo review, the government would still succeed. Beginning first, the defendant cannot show that this affected the verdict. The evidence in this case was overwhelming. We have the victim's testimony of the assault on her that was corroborated by the photos of her injuries and the video of the assault. We have her testimony that there was a window in the door which allowed her to see fully into the cell that was not impeached at all on her cross-examination. We have the corroboration of Dr. Cristiano as to her injuries, as well as we have the defendant's testimony. First, stating that the victim highly disrespected him in his opinion. Thus, telling the jury he had motive to commit this assault. And then his absolutely incredible testimony where he first testifies that he did not tell the detention hearing officer that he was not the one who assaulted the victim because he was afraid of being called a rat. And then changing his testimony at the end claiming, in fact, that he did, in fact, say that despite the fact that he is still at the same facility and still could be subject to being a rat. At this point, there is absolutely no reason to believe that that one tiny piece of testimony affected the verdict. In addition, the district court did not err in admitting those statements. It's well settled that Miranda warnings are not required unless you're in custody and you're subject to interrogation. Neither occurred in this case. The fact that he is in prison, as told under Schatzer and Turner in this case, in the circuit, does not necessarily lead to a finding of custody. None of the circumstances, as we outlined in our brief, show a coercive environment or that he was forced to be there. In fact, he was advised twice before the hearing and during the hearing itself that he did not have to attend and that he was free to leave at any time. He was in the SHU Special Housing Unit at the time of the assault as well as the time of this hearing. Doctor, I'm sorry, Ms. Schluter testified that it is policy and procedure for prisoners in the SHU to be escorted to and from in custody as well as at ER 91 to be cuffed during the hearing. So he faced no detention beyond what he would face in a normal prison setting. There was no aggressive confrontation with guilt. There was nothing else to lead us to believe that this was a coercive environment. Nor was he interrogated. Simply asking somebody, do you wish to make a statement, is not the type of question that would lead a reasonable person to believe he needs to incriminate himself. For all those reasons, Your Honor, we believe that the District Court did not err in denying the motion to disperse. We would ask that you affirm the conviction and the sentence. There's no further questions? The government will submit. Thank you. Thank you. Mr. Roach, you have time for a rebuttal. Thank you, Your Honor. Thank you. Page 79 of the government's supplemental excerpts of record are the testimony of the neurologist that periodically before this event occurred, when she was involved, when the detention officer was involved in physical activity, the machine would periodically stop working. And so therefore, the equivalent conclusion could be drawn that at this particular time it briefly stopped working because of the physical altercation with Mr. Flores. In other words, that he did not cause the migration. And that's further supplemented by she waited four and a half months to go talk to the neurologist. If it had stopped functioning and just didn't function, I would submit to you she would have done that before the hip surgery. She would have managed her pain. That's why I submit that the pain that she felt at the time of this event was not caused by the dire of getting migrated. However, in Garcia Camacho, that was cited by the government, the Court of Appeals of the Ninth Circuit Mr. Garcia previously said the term involved in a serious physical injury is one that we are not deciding in this case is how attenuated that can be. Because Mr. Garcia, he did not cause any physical damage to her body that caused her to feel pain. The pain was existing, pre-existed, and had pre-existed for years. So when you're talking about what is the purpose of aggravated assault versus regular assault and what the term involved means, my argument would be that this is too attenuated. In Garcia Camacho, the example that the Ninth Circuit used was what if an agent's ankle was broken during a wrestling match with a suspect. He said, well, what if he'd been handcuffed and walking back to his car and tripped and fell and broke his ankle? Would that have caused the or would that involve serious physical injury? And they refused to answer the question. But my point to you in what I'm asking for is that you determine that this attenuation is too far attenuated for the term involved to be used and therefore none of the applications of the sentencing guidelines should be applied when it comes to serious physical injury. Thank you, counsel. Thank you both for your arguments today. The case is submitted and we will now proceed with our second argument of the day. That is Christopher O'Neill versus Rene Baker case number 20-15093.
judges: Jack, Nelson, Hunsaker